**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 23-CR-382 (DLF)** |
| | ) | |
| **BROGAN WELSH,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the

above-referenced case. For the reasons set forth below, the government recommends a sentence of

151 months of incarceration, followed by ten years of supervised release.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 2, 2020, a Task Force Officer with the Washington Field Office of the FBI

was acting in an undercover capacity (UC) as part of the Metropolitan Police Department-Federal

Bureau of Investigation Child Exploitation Task Force, operating out of a satellite office in

Washington, D.C. In that capacity, the UC was posing online as the father of a nine-year-old son.

The UC was invited to join a private group on a social media application. The purpose of the group

was to discuss the sexual abuse of minor boys as well as to share child sexual abuse material. A

user with the name "gayboy69freak," subsequently identified as the defendant, sent a direct

message to the UC stating that he was a 28-year-old male residing in Richmond, Virginia, who

had a sexual interest in minor children as young as five years old.

The defendant expressed interest in traveling to Washington, D.C. to sexually abuse the

UC's purported nine-year-old son. The defendant also expressed interest in urinating on children

and disclosed to the UC that he had had sexual contact with a younger family member.

On December 17, 2020, the defendant posted two mega.nz links to the chat that contained child pornography. The UC responded, "that link was nice dude, plenty of cute little boys." The defendant then stated, "Just sent another."

Law enforcement reviewed the images and videos contained in the mega.nz links. The first link contained over 40 thumbnails of videos depicting the sexual abuse of children. The second link included several folders containing child sexual abuse material. One of these folders was labeled with the name "young boy" and several of the videos contained therein were labeled with names including the age of the child being sexually abused in the video – for example, "8yEricANDFriend." A description of some of these videos is included below:

a.  **5_611404773727404:** This video shows a female toddler lying on her back fully nude. The child's legs are raised in the air, and they are being held by an adult man's hands. The adult man is pressing his face against the toddler's exposed genitals.

b.  **[boy + man] 10yo boy getting fucked then cum on his little cock:** This is a ten minute and forty-five second video that depicts a prepubescent minor male being anally penetrated by an adult male's erect penis. The boy is laying on his back with penis exposed, while an adult male penetrates his anus with his penis.

c.  **[boy + boy] Alex 13yo + Sven 11yo:** This is a seventeen minute and thirty-four-second-long video that depicts a pubescent and prepubescent boy placing their mouths on each other's penises and touching each other's penises.

d.  **[boy + man] S00-Ksbino 10 + man:** This is a nineteen minute and fifty-second-long video that depicts a prepubescent male masturbating while laying down on a bed. An adult male's fingers are observed touching the child's anus while the boy masturbates.

Over the next few weeks, the defendant continued to communicate with the undercover officer, discussing his sexual interest in children and his interest in traveling to Washington, D.C. to sexually abuse the UC's purported son.  For example, on December 17, 2020, the following exchange occurred:

WELSH:      So am I coming Sunday for a night of sex?

WELSH:      That's like the only day I could

UC:         I can do Monday after he finishes school

UC:         Yah he's got something planned with a friend and his mom will lose her shit if he misses that

WELSH:      What time is that until?

UC:         Unsure, it starts at 7

WELSH:      Maybe after: I work Monday-Friday 11-8

UC:         Ah man. You can't take a couple hours off for a "family" thing on Monday?

WELSH:      I mean it's two hours there and back so I'd have to take like all of Monday and I doubt they will let me this late

UC:         Hey also, I get some people play fantasy on here with this stuff but I just wanted to let you know if that's the deal with you it's all good. No hard feelings.

WELSH:      I don't think I'd be trying to come Sunday if that were the case lol

On December 29, 2020, the defendant sent the following messages to the UC:

WELSH:      I still want to put my cock in your boy so bad

WELSH:      So fucking bad

WELSH:      I just want to hold his hips down and pound his small boy hole

WELSH:      Have him moaning and wake up while I'm pounding him

WELSH:      Show him what real boys do

The defendant repeatedly asked for photos of the UC's son, asking to see "his little cock" and his "ass." He also told the UC that he pretended to be a 14-16 year-old boy on social media in order to chat with 10-14-year-old boys and that they "sometimes" sent him photos of themselves.

The defendant communicated sporadically with the undercover officer through June 2021. The defendant continued to express a sexual interest in the UC's purported son, but did not travel to the District of Columbia.[1]

On August 4, 2023, FBI-Anchorage executed a search warrant on a phone in an unrelated case. A review of that phone revealed chats on the same social media application between the defendant and another individual during July 2023. During these chats, the defendant again repeatedly described his interest in sexually abusing minors.

On October 19, 2023, law enforcement executed search warrants at the defendant's residence in Anchorage, Alaska. The search warrants authorized law enforcement to search and seize, among other items, mobile phones and computers accessed by the defendant.

When FBI agents arrived at the defendant's residence, they could see the defendant seated inside the home in a room near the front door with his laptop in his lap. As FBI agents knocked on the door, the defendant ran into the residence, carrying the laptop computer. FBI agents knocked on the door multiple times, but no one answered and, ultimately, agents breached the door. When agents entered the apartment, they encountered the defendant coming from his bedroom. Law enforcement located the defendant's laptop computer in his bedroom; however, it had been erased

---

[1] Subsequent investigation by law enforcement showed that the defendant had been located in Virginia during the initial part of his communication with the UC, but later was located in Alaska.

4

and no data was able to be recovered.

Law enforcement also recovered a cell phone belonging to the defendant. The forensic analysis of the phone revealed that he had installed and was using the social media application. On October 26, 2023, FBI obtained a warrant authorizing the search of his account. A review of the account showed that between September 26, 2023, and October 19, 2023, the defendant distributed and received over twenty-six videos and twenty images depicting the sexual abuse of young children.  A description of some of this material follows:

a) A 90-second video showing an adult male placing his mouth on the vagina of a prepubescent girl.

b) A nearly two-minute video showing an adult male using his penis to penetrate an infant. The baby can be heard crying in this video.

c) A forty-four second video showing an adult man anally penetrating a prepubescent boy. The child is blindfolded, and he is grimacing in pain throughout the video.

In the defendant's bedroom, law enforcement located sex toys that were very small and consistent with the body size of child, including a silicon ring of the type commonly referred to as a "cock ring," a bag of "sensory finger rings," which are devices for manual sexual stimulation, and a very small dildo consistent in size with anal penetration. Law enforcement also found two pairs of underwear and one pair of pajama bottoms; these items were too small for an adult and consistent with that of a young boy.

The defendant resided in the home with his friend, her boyfriend, and her ten-year-old son. Law enforcement interviewed the child's mother, who stated that the defendant was like a father to her son. The child was forensically interviewed and did not make any disclosures of abuse.

On September 23, 2024, the defendant pled guilty to two counts of Distribution of Child

Pornography, in violation of 18 U.S.C. § 2252(a)(2), based on his conduct in D.C. and in Alaska. Sentencing is scheduled for March 19, 2025.

## DISCUSSION AND RECOMMENDATION

### I.    Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing

disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II.    The U.S. Sentencing Commission's 2012 and 2021 Reports on Child Pornography Offenses

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports criticize certain enhancements in the current Guidelines and recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

7

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at 325.

## III.    Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the Presentence Report, estimating a final offense level of 34 and a Guidelines range of 151-188 months of incarceration.

## IV.    Government's Sentencing Recommendation

The government recommends a Guidelines sentence of 151 months of incarceration, to be followed by ten years of supervised release. This sentence recognizes that the defendant engaged in the offense behavior on multiple occasions, over a period of years, and also ensures that he will be monitored for a significant period of time upon his release. It recognizes the presence of an aggravating factor identified by the U.S. Sentencing Commission and also aligns with the sentencing factors outlined in 18 U.S.C. § 3553(a).

## V.    The § 3553(a) Factors Support a Sentence of 151 Months of Incarceration.

### A.    Nature and Circumstances of the Offense

The defendant's conduct is extremely serious. He distributed images of prepubescent children, including infants and toddlers, being raped – not just once, but on multiple occasions, over a period of at least two years. The children captured in the videos cavalierly shared by the defendant were traumatized and victimized in the worst way imaginable at the time the material was created, and they are re-victimized and re-traumatized each and every time an individual, like the defendant, views or shares the images for his own sexual gratification.

The defendant cannot claim that he did not realize, or appreciate, that the children in the images he possessed and distributed were real victims of sexual abuse. The defendant communicated with a man whom he believed was sexually abusing his own nine-year-old son and, rather than report the man to law enforcement, or – at minimum – cease communicating with him, the defendant instead encouraged the further abuse of this child, even suggesting additional ways that the UC could abuse the child – including by instructing the UC to ejaculate in the child's food and in his toothpaste. The defendant asked for photos of the child, telling the UC to "go lower" when the UC sent a photo pulling down the top of the child's underwear, and requested child pornography of the child's "little cock" and "ass." The defendant's willingness to use a child that he believed was being sexually abused for his own sexual gratification is appalling.

Moreover, the government notes that the defendant's conduct exhibits an aggravating factor discussed by the U.S. Sentencing Commission in its 2012 and 2021 reports – namely, community. The defendant repeatedly engaged with online communities dedicated to trafficking child sexual abuse material and promoting the sexual abuse of children. Far from being a passive

participant, he engaged with multiple individuals, encouraged them to abuse children, including the UC, and distributed numerous videos of child sexual abuse material to others.

In short, the conduct that brings the defendant before the Court was not a mistake or an error in judgment. The defendant distributed numerous videos of children being raped on multiple occasions over a period of at least two-and-a-half years. He requested child pornography of what he believed to be a real nine-year-old boy who was actively being abused, and he encouraged the further abuse of that child. Given the serious nature of the defendant's criminal conduct and, notably, the presence of an aggravating factor recognized by the Sentencing Commission, a significant period of incarceration above the mandatory minimum sentence is appropriate.

B.    History and Characteristics of the Defendant

The defendant has no criminal history points and only one prior traffic-related arrest. In addition, the government acknowledges the defendant's childhood abuse. However, this history does not explain or justify why, once the defendant was an adult – and, unlike many other individuals, had the benefit of therapy – he chose not only to traffic in child pornography, but to actually encourage the sexual abuse of another child and to request child pornography of that abused child. Indeed, the defendant's statements to the psychosexual evaluator show an attempt to minimize his offense by wholly ignoring his egregious conduct towards the UC's child. Moreover, the defendant's decision to engage in the offense conduct while living with, and caring for, a ten-year-old boy – and concealing his behavior from the child's mother – is deeply concerning. This conduct displays a significant level of deceit and manipulation.

Thus, while the defendant's lack of criminal history and childhood abuse may weigh in his favor, other aspects of his history and characteristics – including the psychosexual evaluator's

conclusion that the defendant poses an Above Average risk of reoffending – nonetheless call for a

significant period of incarceration, well above the mandatory minimum.

       C.    <u>Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense</u>

Child pornography offenses are extremely serious because they result in perpetual harm to

the most vulnerable victims, while simultaneously validating and normalizing the sexual

exploitation of children. Courts across the country have recognized this:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669

F.3d 723 (6th Cir. 2012).[2]

When enacting mandatory minimum penalties for those who produce and traffic in

the sexual abuse and exploitation of children, Congress similarly described the evil of child

pornography:

---

[2] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

Traffickers of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children.

Here, the defendant made the conscious decision to share numerous videos of children – including infants and toddlers – being  raped, on multiple occasions. Significant incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offenses.

      D.      <u>Adequate Deterrence and Protection of the Public</u>

The possession and trafficking of child pornography endangers the public by encouraging the rape, violence, and abuse of children. In *United States v. Miller*, the Fifth Circuit stated:

> [R]eal children are being abused and violated when pornographic images are made. Without a market for such images, and without a strong appetite for more and more images exhibited by [defendant] and similarly situated defendants, there would be far fewer children who are injured and criminally assaulted in this way.  If a handful of pornographic images taken twenty years ago were sufficient to satisfy the perverse desires of those who possess and traffic in child pornography, we would not have the huge industry that exists internationally today.

665 F.3d 114, 123 (5th Cir. 2011). The importance of deterrence with respect to child pornography offenses is well-established. Serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production:

> The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of

> deterrence suggests that the lighter the punishment for downloading and uploading
> child pornography, the greater the customer demand for it and so more will be
> produced.

*Goldberg*, 491 F.3d at 672; *see also Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also

surely reasonable for the State to conclude that it will decrease the production of child pornography

if it penalizes those who possess and view the product, thereby decreasing demand"); *Goff*, 501

F.3d at 261 ("Deterring the production of child pornography and protecting the children who are

victimized by it are factors that should have been given significant weight at sentencing."); *United

States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child

pornography increases market demand. The greater concern under the Guidelines is for the welfare

of these exploited children. The avenue Congress has chosen to weaken the child pornography

industry is to punish those who traffic in it.").

The defendant's sentence should be sufficient to deter not only the defendant from

reoffending in the future, but also to deter the criminal conduct of others who engage in, or

contemplate engaging in, the trafficking of child sexual abuse material. As stated in *Goldberg*,

"[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it

made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the

punishment for trafficking in child pornography, the greater the customer demand for it and so the

more will be produced." 491 F.3d at 672. *See also Goff*, 501 F.3d at 261 (stating in a child

pornography possession case that "deterring the production of child pornography and protecting

the children who are victimized by it are factors that should have been given significant weight at

sentencing"). The government's recommended sentence of 151 months of incarceration serves this

purpose.

E.    Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [ ]defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.2 with a final offense level of 34 and Criminal History Category I was 106 months during Fiscal Years 2019—2023. The median sentence length was 96 months. However, in the present case, the defendant has pled guilty to *two* separate counts of Distribution of Child Pornography which encompass entirely different incidents. His conduct spanned at least two-and-a-half years and, importantly, also involved directly requesting child pornography – and not merely anonymously traded images, but child pornography of a specific boy whom he believed was being abused.  Given these additional aggravating factors, the government's recommendation of 151 months of incarceration does not create an unwarranted disparity.

F.    Restitution

None of the identified victims in the materials distributed by the defendant are seeking restitution. However, the parent of one of the victims has submitted a Victim Impact Statement, which the government will file under seal. In addition, the mother of the ten-year-old child who

resided with the defendant has submitted an impact statement, which the government will also file under seal for the Court's consideration.

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 151 months, followed by ten years of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY

_   /s/ Caroline Burrell_
Caroline Burrell
CA Bar No. 283687
Assistant United States Attorney
601 D. St N.W.
Washington, D.C. 20530
(202) 815-8613
caroline.burrell@usdoj.gov

16